**FILED**

MAY 1 3 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No. 08-CR-92 (RJL)** |
| | : | **Magistrate No. 08-MJ-12** |
| | : | |
| **v.** | : | **Violation:** |
| | : | |
| **GLORIA A. GONZALEZ-PAZ,** | : | **18 U.S.C. §§ 201(b)(1)(A) and 2** |
| | : | **(Payment of Bribe to a Public Official)** |
| **Defendant.** | : | |

## STATEMENT OF OFFENSE

Pursuant to Federal Rule of Criminal Procedure 11, defendant **GLORIA A.**

**GONZALEZ-PAZ ("GONZALEZ-PAZ")** and the United States agree and stipulate as follows:

1.      Foreign nationals are eligible to obtain District of Columbia driver's licenses if

they have proof that they are legally present in the U.S. and can continue to stay in the U.S. for at

least another six months.  A foreign national must also present proof of his name, date of birth,

social security number, and District of Columbia residency.  The District of Columbia

Department of Motor Vehicles ("DMV") has specifically limited the types of documentation it

will accept.  For example, original birth certificates, unexpired passports, or resident alien cards

can prove an individual's identity (i.e., name and date of birth).  In addition to tendering the

required documentation, a foreign national must complete and sign a driver's license application,

certifying that the information contained therein is correct and accurate.  The DMV employee

processing the application is required to identify on the application the type of documentation

that was presented by the applicant.

2.      Applicants for driver's licenses must pass the following three tests: vision

screening, knowledge and street sign recognition, and skills road.  Applicants who possess a

valid driver's license from another state, however, are only required to pass the vision screening

test.  Applicants who possess a valid driver's license from a foreign jurisdiction need not take the road test, but must successfully pass the vision screening and knowledge and street sign recognition tests.

3.      On November 30, 2006, at approximately 1:27 p.m., defendant **GONZALEZ-PAZ** sought the assistance of DMV employee Patricia Gonzalez to renew her District of Columbia driver's license even though defendant **GONZALEZ-PAZ** no longer resided in the District of Columbia.  Gonzalez also extended the driver's license expiration date until March 8, 2012, even though defendant **GONZALEZ-PAZ**'s Employment Authorization Document bore an expiration date several years prior to that date.

4.      Defendant **GONZALEZ-PAZ** and Gonzalez continued to see each other when Gonzalez and her DMV colleagues ordered food from Tropicana Eateries, a Jamaican food carry-out that defendant **GONZALEZ-PAZ** and her husband owned and operated nearby DMV's Brentwood branch.   In the Spring of 2007, defendant **GONZALEZ-PAZ** asked Gonzalez if she would do her a favor: issue a driver's license to defendant **GONZALEZ-PAZ**'s uncle who was unable to speak English and to read or write in Spanish.  Gonzalez agreed and issued the license even though defendant **GONZALEZ-PAZ**'s uncle did not complete an application or pass the vision, knowledge, and road skills examinations.  Sometime thereafter, in the Spring of 2007, defendant **GONZALEZ-PAZ** began bringing other foreign nationals to Gonzalez to obtain facially valid driver's licenses.  Most of these individuals were not eligible to obtain such driver's licenses because they did not reside in the District of Columbia or were not legally present within the U.S. or for as long as Gonzalez entered into the DMV computer system.  Defendant **GONZALEZ-PAZ** brought dozens of individuals to the Brentwood and Georgetown

DMV branches to obtain facially valid driver's licenses from Gonzalez. Although she told

Gonzalez that she was just helping these individuals out because they were unable to read,

defendant **GONZALEZ-PAZ** received between $1,000 and $1,700 from these individuals to

broker Gonzalez's assistance. In return, defendant **GONZALEZ-PAZ** paid Gonzalez between

$500 and $700 for each fraudulent license that Gonzalez issued. During the scheme, defendant

**GONZALEZ-PAZ** paid Gonzalez at least $10,000 to issue these licenses in violation of the law.

     5.     For example, on November 28, 2007, a Cooperating Witness (hereinafter referred

to as "CW") telephonically contacted defendant **GONZALEZ-PAZ** to attempt to illegally

purchase a District of Columbia driver's license. Although she had never met the CW, defendant

**GONZALEZ-PAZ** told him that the cost of the license would be $1,600.00. On December 5,

2007, defendant **GONZALEZ-PAZ** told CW over the telephone to find a legitimate social

security number and memorize it without writing it down. Defendant **GONZALEZ-PAZ** further

warned CW that an employee at the DMV would process the transaction, but if he got caught, he

must deny knowing the DMV employee. Defendant **GONZALEZ-PAZ** later increased the cost

of her services for fraudulently obtaining a D.C. driver's license for CW from $1,600.00 to

$1,700.00. The following day, on December 6, 2007, defendant **GONZALEZ-PAZ** picked up

CW in her Nissan minivan, at the intersection of 14th Street N.W. and Columbia Road N.W.

Defendant **GONZALEZ-PAZ**'s 15-year-old daughter (hereinafter referred to as "Juvenile") and

two other unidentified individuals, who appeared to be of Hispanic descent, were also in the

minivan. Since CW did not have a check to pay the $39 DMV charge for the license, defendant

**GONZALEZ-PAZ** told CW to give her the $39 cash and, in return, defendant **GONZALEZ-**

**PAZ** gave CW a blank personal check drawn from a Bank of America account in the name of her

husband.   As she was driving to Georgetown, defendant **GONZALEZ-PAZ** took fifteen $100 bills and four $50 bills, totaling $1,700, from CW.  When they arrived at the Georgetown DMV, Juvenile escorted CW into the Georgetown Park Mall and instructed him to go to the clerk at window number three where Gonzalez was sitting.  Gonzalez did not ask CW to provide any of the required documentation regarding CW's name, date of birth, or D.C. residency.  CW was also not asked or directed to complete any of DMV's required tests for vision, knowledge, or road skills.  In addition, CW did not provide any proof of U.S. citizenship or legal resident alien status.  Gonzalez, nevertheless, issued a facially valid driver's license to him with an expiration date of April 30, 2012.

6.      On the same day, defendant **GONZALEZ-PAZ** arranged for Jose Andrades to obtain a facially valid D.C. driver's license.  On the previous day, December 5, 2007, Andrades had telephoned C.H., who told him to meet defendant **GONZALEZ-PAZ** at a McDonald's on Route 1, in Riverdale, Maryland.  When he arrived at the McDonald's, Andrades saw defendant **GONZALEZ-PAZ** and Juvenile sitting in the front seat of a silver Nissan Quest minivan with two other individuals in the backseat.  Defendant **GONZALEZ-PAZ** told Andrades to follow her into Washington, D.C.  After she parked on M Street, defendant **GONZALEZ-PAZ** got out of her minivan and met Andrades on the sidewalk where he paid her $1,200 in U.S. currency.  They walked into the Georgetown Park Mall, and defendant **GONZALEZ-PAZ** told Andrades to go to window number four where Gonzalez was sitting.  Andrades gave Gonzalez his Maryland Identification and Social Security cards.  He did not  complete an application, provide verification of D.C. residency, or take the vision, knowledge, and road skills tests.  Gonzalez, nevertheless, issued a facially valid driver's license to him with an expiration date of June 20,

2012.

GLORIA A. GONZALEZ-PAZ, defendant