## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No. 08-CR-92 (RJL)** |
| | : | **Magistrate No. 08-MJ-12** |
| | : | |
| **v.** | : | |
| | : | |
| **GLORIA A. GONZALEZ-PAZ,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States by and through its attorney, the United States Attorney for the District of Columbia, hereby submits the following memorandum in aid of sentencing. As discussed below, the government moves this Court to sentence defendant to a 30-month term of incarceration, in accordance with the United States Sentencing Guidelines and 18 U.S.C. Section 3553.

## I.  FACTUAL BACKGROUND

On January 16, 2008, defendant and her fifteen-year-old daughter left their spacious suburban Maryland home and drove into the District of Columbia to make some money. In addition to the carry-out Jamaican-style restaurant she and her husband successfully operated in the northeastern quadrant of the District, defendant had a lucrative side business: she sold facially valid District of Columbia driver's licenses to dozens of individuals who were either unable or ineligible to obtain them in a legal manner.

At approximately noon, completely unaware that she and her daughter had been under surveillance by law enforcement for several months, defendant parked her minivan on M Street, N.W., outside the Georgetown branch of the D.C. Department of Motor Vehicles ("DMV"). A

1

gray Toyota sedan, bearing Virginia tags, parked directly behind her.  The Toyota's passenger, Dora Morales (Cr. No. 08-19), approached defendant and paid her $1,500 in cash.  Then, Morales and defendant's daughter crossed the street, entered the Georgetown Park Mall, and took the elevator down to the DMV.  Once defendant's daughter showed Morales which DMV employee to contact, she returned to her mother's vehicle.  Without completing an application or taking any of the required examinations, Morales obtained a facially valid D.C. driver's license. Shortly thereafter, defendant exited her vehicle and went to the food court inside the mall where she paid the DMV employee, Patricia Gonzalez (Cr. No. 08-100), $700.  Minutes later, defendant, her daughter, and Jose Concepcion Bonilla, the backseat passenger in defendant's minivan, were apprehended.[1]  Defendant was placed under arrest.  During the customary search incident to arrest, the remainder of the money Morales had paid her, i.e., $800 in $100 bills, was found in her pocket.[2]

The following day, on January 17, 2008, defendant was presented before United States Magistrate Judge John M. Facciola and formally charged with Conspiracy to Transfer Identification Documents Produced Without Lawful Authority, in violation of 18 U.S.C. Section

---

[1] Bonilla had no form of identification.  After he admitted to an ICE agent that he was not legally present in the U.S., he was taken into custody for deportation proceedings.  Bonilla claimed that he and his wife, Maria Concepcion Portillo, resided in defendant's home, which is consistent with the information defendant told Probation Officer Moses-Gregory, i.e., she and her husband rented three rooms for $1,600 a month.  If Bonilla was one of her tenants, she could be prosecuted under 8 U.S.C. Section 1324(a)(1)(A)(iv), which makes it punishable for any person who "encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law."  Because defendant realized "private financial gain" through rent receipts, she could face, if convicted, a ten-year term of imprisonment.  See 8 U.S.C. Section 1324 (a)(1)(B)(i).

[2]An additional $212 in cash was found in her purse with several credit and debit cards.

1028(a)(2) and (f). Defendant was released on several conditions, including that she post a

$250,000 unsecured bond.

On May 13, 2008, defendant accepted the government's offer and pled guilty to a one-

count Information, charging her with paying a bribe to a public official, in violation of 18 U.S.C.

Sections 201(b)(1)(A) and 2. She refused, however, to assist in apprehending any other

individuals involved in her scheme. Her sentencing hearing is scheduled for August 12, 2008, at

2:00 p.m.

II.    **SENTENCING RECOMMENDATION**

A.    Sentencing Guidelines

Both parties agreed to the Guidelines calculations utilized in the Presentence

Investigation Report ("PSR"), which correctly calculated defendant's adjusted offense level at

20. See PSR at ¶31. This includes the base offense level of 12, pursuant to U.S.S.G. Section

2C1.1(a)(2), and a six-level enhancement for more than one bribe and the payment of more than

$10,000, pursuant to U.S.S.G. Sections 2C1.1(b)(1) and (2). The parties agreed to an additional

two-level enhancement because defendant used her minor child to commit the crime, as set forth

in U.S.S.G. Section 3B1.4. Finally, the government agreed not to oppose a three-point reduction

for acceptance of responsibility, yielding a total offense level of 17. See PSR at ¶34. The PSR

also correctly calculated defendant's criminal history as Category I. See PSR at ¶37. Offense

level 17, with criminal history category of I, results in a sentencing range of 24 to 30 months.

See PSR at ¶72. The statutory maximum term of imprisonment for bribing a public official is

fifteen years.  18 U.S.C. Section 201(b).[3]

      B.     <u>Sentencing Factors Under 18 U.S.C. Section 3553</u>

As the Court is well aware, the recommended sentence set forth in the Sentencing

Guidelines is but one factor this Court should consider in determining an appropriate sentence.

The Court should also consider the factors set forth in 18 U.S.C. Section 3553.[4]  As set forth

below, these additional considerations provide a basis in this case for a 30-month term of

incarceration - the top of the guideline range.

      1.     <u>Nature and Circumstances of the Offense</u>

The Sentencing Guidelines do not fully address the nature and circumstances of

defendant's criminal conduct.  The resulting guideline range calculation was only based on the

payment of more than one bribe and a total amount paid of $10,000.  The evidence, however,

indicates that defendant's conduct was much more extensive.  It involved the production of

dozens of fraudulent licenses, requiring the payment of many more bribes, totaling considerably

---

[3] The Court may also impose a fine of $250,000 or three times the monetary equivalent of the thing of value given to the public official, an order of restitution, and a term of supervised release of up to three years if defendant is sentenced to any term of imprisonment.  As indicated in the PSR, the Court must impose a $100 special assessment regardless of the sentence imposed. <u>See</u> PSR at ¶84.

[4] Section 3553(a) factors include:(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for the offense as set forth in Guidelines; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

more than $10,000.  Further, defendant personally pocketed a considerable amount of money, which was often more than the amount of the bribe.  As detailed below, it would be appropriate under this prong of Section 3553 for the Court to impose the harshest sentence available under the applicable guideline range.

At least a year before her arrest, defendant began offering bribes to DMV employee Patricia Gonzalez to bypass DMV's many internal computer controls that are used to insure that driver's licenses are only issued to individuals meeting the legal qualifications and passing the required vision, knowledge, and road skills examinations.  Defendant knew from personal experience that Gonzalez was willing to bend DMV's strict rules regarding the issuance of driver's licenses to foreign nationals.  Indeed, on November 30, 2006, Gonzalez renewed Paz's D.C. driver's license even though Gonzalez knew defendant no longer resided in D.C.  Gonzalez also improperly extended the expiration date of defendant's driver's license until March 8, 2012, even though defendant's legal residency status in the U.S. was set to expire several years before that date.[5]  Gonzalez also, at defendant's urging, issued a driver's license to defendant's uncle, who defendant claimed was illiterate and, thus, unable to pass the written examination.

On average, defendant paid Gonzalez between $500 and $700 per fraudulent driver's license.  Defendant misled Gonzalez to believe that the individuals to whom she issued these facially valid driver's licenses were like defendant's uncle: they could not speak English and could not read in their native Spanish language.  Defendant also created the false impression that

---

[5] DMV regulations specifically limit the duration of the driver's license to the period of time the applicant has been granted permission to stay within the U.S.  Therefore, the driver's licenses issued to foreign nationals should automatically expire on the date their legal status ends. The DMV clerk must enter the expiration date as reflected on the immigration documentation presented at the time the license is issued.

5

she was simply helping these individuals with whom she sympathized and kept no money for herself.[6]

In reality, however, defendant kept at least half the money for herself.  It was not sympathy, but greed that fueled defendant's illegal activities.  She preyed on many hard-working immigrants who barely earned enough to get by.  Jose Andrades (Cr. No. 08-62), for instance, used  all the cash he had saved in a Coke bottle - $1,200 - to pay defendant's exorbitant fee.  He had to borrow another $300 from a relative to pay the man who introduced him to defendant.  Similarly, housekeepers Marina Montiel (Cr. No.08-78), Violeta del Orbes Mercedes (Cr. No. 08-77), Dora Morales (Cr. No. 08-19), and construction worker Rene Garcia (Cr. No. 08-107), paid defendant money they had struggled to save.[7]

Defendant further lied to Gonzalez about the backgrounds of many of the individuals who were issued D.C. driver's licenses.  Not all were foreign nationals with legal authorization to reside and work in the U.S.  To the contrary, defendant knowingly brought many individuals to the DMV who lacked any legal status.  They often presented false names, Social Security numbers that were either invalid or belonged to others, and fictitious D.C. addresses.  For example, on November 20, 2007, defendant sent a man to Gonzalez, who identified himself as

---

[6] After their arrests, defendant and Dora Morales were talking to one another from their respective holding cells.  Even though Morales' $800 was found in defendant's pocket, she falsely stated to Morales hat she gave all the money to Gonzalez.  Defendant claimed that she felt sorry for Gonzalez because she had a lot of children.  She further attempted to minimize her culpability by telling Morales that she had only helped three people in the past.

[7] Through word of mouth in the Hispanic community, defendant advertised her services and encouraged others, some of whom received their own fees, to promote her business.  Andrades and Montiel learned about defendant while they were riding a Metro bus to work and Mercedes was given defendant's telephone number at the Beltsville branch of Maryland's Motor Vehicle Administration after failing the written examination for the second time.

Gilberto Morales.  He provided a date of birth and Social Security number that did not match the information maintained by the Social Security Administration ("SSA") and gave a non-existent D.C. address.  According to the Immigration and Customs Enforcement Agency ("ICE"), there is no record of his entry into the U.S.  Similarly, on December 6, 2007, defendant sent a woman into the Georgetown branch of the DMV to meet with Gonzalez, who claimed that her name was Rosa Ayala Mejia and she was born on April 2, 1985.  The Social Security number she gave Gonzalez, however, was invalid (i.e., it had not been issued by the SSA).  She also gave Gonzalez a non-existent D.C. address, and the alien registration number she provided was never issued to her by the immigration authorities.  In fact, ICE has no record of her entry into the U.S.

It is obvious from defendant's dealings on November 28, 2007, with a FBI cooperator that defendant simply did not care.  Although she had never met him, defendant agreed to help the FBI cooperator procure a fraudulent D.C. driver's license as long as he paid her $1,600.  She made absolutely no effort to determine his true identity.  She did not even ask him his name.  Indeed, it is clearly evident from their conversation that she knew he lacked the proper documentation: she told him to find a "legitimate Social Security number" and to memorize it without writing it down.

Further, defendant's clientele was not limited to the local jurisdictions.  On November 30, 2007, two men in a vehicle with New York State tags parked directly behind defendant's minivan on M Street, N.W.  At approximately the same time Marina Montiel (Cr. No. 08-78) obtained her fraudulent driver's license, one of these men went into the DMV and without completing an application or taking any of the required examinations falsely claimed to reside in D.C. and obtained a driver's license.  The man identified himself as Jose Sanabria and provided a

valid Social Security number.  SSA records, including his application and wage information,

confirm that Sanabria resides in New York.  Indeed, on May 6, 2008, Sanabria surrendered his

fraudulently obtained D.C. driver's license to the New York State Department of Motor Vehicles

and obtained a New York driver's license without having to take any examinations.

2.        Defendant's History and Characteristics

Defendant has lived the American dream.  Since her illegal entry into the U.S. in 1990,

defendant has married, reared four children, purchased two homes, and operated a successful

take-out food and catering business.  She has been fortunate that both her parents and other

family members similarly emigrated from El Salvador and live nearby.  Yet, it was not enough.

Even if it meant exploiting members of her own community, defendant endeavored to further

enrich herself.[8]  This Court should place little weight on the letters submitted on defendant's

behalf because, as is often the case, these individuals lack a full understanding of defendant's

true character.

3.        Seriousness of the Offense

Obviously, the issuance of driver's licenses to individuals who have not met the testing

requirements creates a serious public safety hazard.  Although one may sympathize with those

individuals who repeatedly failed the knowledge examination due to illiteracy, it is axiomatic

that a driver who cannot read street signs is a danger to the community.  Lucinda Babers, the

---

[8] As a result of her greed, defendant has shown no respect for the U.S. legal system. In addition to the charged conduct, Officer Moses-Gregory noted defendant's improper commingling of business funds.  Defendant was also unable to explain how she and her husband accumulated the funds to purchase their business.  See PSR at ¶ ¶56 and 63.  Although defendant portrayed her family's earnings as meager, her husband claimed on the November 2006 mortgage application for their new home that his monthly income was $8,400.

8

Director of the D.C. Department of Motor Vehicles, explained that defendant's actions "decreased road safety by allowing individuals onto roadways without any verification that they were educated on safety and road knowledge." See Government Exhibit 1, p.3. Director Babers referred the Court to a 2008 Allstate America's Best Drivers report that found "D.C. drivers are 84 percent more likely to be in an accident than the average driver nationally." Id. She further explained that this high accident rate results in increased insurance fees, which could explain why 20 percent of D.C. drivers are uninsured. Id.

The threat to road safety is beyond District lines. Investigator H.J. Crance from the Maryland Motor Vehicle Administration explained that Maryland "does not require the out of state applicant who holds a valid license from another State to verify their identity or re-certify their driving proficiency through re-examinations." See Government Exhibit 2, p.1. Likewise, the Commonwealth of Virginia honors its reciprocity agreement with the District and "waive[s] standard knowledge and skills testing based upon the applicants' out-of-state surrenders." See Letter from SSA Daniel C. Kelly, Commonwealth of Virginia Department of Motor Vehicles (attached as Government Exhibit 3). According to D.C. DMV records, 20 fraudulent licenses issued by Gonzalez have been surrendered to other jurisdictions, who converted those fraudulent D.C. licenses into facially valid licenses without requiring the applicants to re-take any examinations. Agent Kelly confirmed that Virginia records reflect that five individuals obtained Virginia driver's licenses without taking any examinations based upon their surrender of these fraudulent D.C. licenses. Even more disturbing, Agent Kelly found that these individuals were not eligible to obtain a Virginia driver's license "for various reasons," which included previous driving infractions of a serious nature, such as driving while under the influence, crashes, or

reckless driving.  <u>See</u> Government Exhibit 3.

The Court is well aware that driver's licenses not only grant individuals the privilege to drive, but "are commonly viewed and accepted world wide as a form of one's identity." Government Exhibit 2, p.1.  "Identity is a priceless commodity," and as such, Director Babers opined that the impact resulting from the issuance of these fraudulent licenses "cannot be fully assessed in terms of the security of the District and our nation."  Government Exhibit 1, p.1.  It is unknown "whether these credentials involved identity theft, a multi-billion dollar crime in the U.S.  Further, it is unknown whether these credentials were used by criminals or terrorists seeking to do harm to the District of surrounding community."  Government Exhibit 1, pp.1-2. Maryland MVA Investigator Crance echoed Director Babers' concerns:

> The potential damage can be devastating and may range from the mere purchase of alcoholic beverages by a minor, to using the illegal license to carry out criminal activities or masking one's identity to enter an airport for access to aircraft executing a terrorist plot.

Government Exhibit 2, p.2.

Knowing the value other jurisdictions place upon the integrity of its driver's licenses and identification cards, the District has spent 45 million dollars since 2002 "to further tighten security and improve processes."  Government Exhibit 1, p.2.  The D.C. licensing system includes links to verify Social Security numbers and the authenticity of out-of-state licenses.  <u>Id.</u>, pp.2-3.  Likewise, other jurisdictions and law enforcement agencies access D.C. DMV records to verify information, including citizenship.  The majority of licenses issued by Gonzalez were not supported by proper documentation of legal status within the U.S.  Not surprisingly, ICE has confirmed that 42 individuals who obtained fraudulent licenses are not legally residing in the

U.S., and of these 42, nine have previously been deported.  Since Gonzalez did not provide valid identifiers for many of the individuals who obtained fraudulent licenses, ICE was unable to find records for 79 individuals who had obtained fraudulent D.C. driver's licenses.

As a result, the District's "reputation as a jurisdiction that only credentials citizens and legal immigrants" has been "tarnished."  Id., p.2.  When false information is entered into an agency's database, such as the D.C. DMV, Investigator Crance explained that such information "must be purged," requiring extensive investigation and expending already depleted government resources  Government Exhibit 2, p.2.  Agent Kelly estimated that the Virginia DMV will have "to invest a considerable amount of time to maintain the integrity of [its] customer data."  Government Exhibit 3.  This will include cancelling licenses already issued based upon the surrender of these fraudulent D.C. driver's licenses and periodic reviews when additional surrenders occur.  Id.

Congress has recognized the serious consequences that could result from the issuance of facially valid driver's licenses by providing sentencing enhancements for such offenses.  See 18 U.S.C. Section 1028(b)(1)(A)(ii) (penalty for fraud in connection with identification documents increased from 5 to 15 years where the identification document is a birth certificate, driver's license or identification card); U.S.S.G. Section 2C1.1(b)(4) (two-level increase of a defendant's offense level where the defendant facilitated "the obtaining of a government identification document.").  Although the Guideline enhancement only applies to the public official, this Court should nevertheless consider sentencing defendant more harshly because her criminal conduct involved the procurement of government-issued identification documents.

4.    The Need to Promote Respect for the Law
and Deter Similar Criminal Conduct

Director Babers noted in her letter to the Court that the D.C. DMV has previously been victimized by corrupt employees. "In the past 5 years," Director Babers counted two DMV employees and four cashiers that "have been arrested and charged with illegal activities." Government Exhibit 1, p.3. Since 2000, the D.C. Office of Inspector General has investigated approximately 20 individuals regarding allegations of criminal conduct at the DMV. One of these investigations led to the prosecution of DMV employee Rosa Chavez, who was charged on May 26, 2005, in a one-count Information with receipt of a bribe by a public official. See Cr. No. 05-198 (JGP). The nature of her criminal activity was strikingly similar to the scheme employed by defendant and Gonzalez in this case. Chavez input false information into the DMV database and issued facially valid driver's licenses. Typically, Chavez worked with a middle person, who solicited individuals in need of valid driver's licenses, but who, for a variety of reasons, could not or did not want to obtain such licenses through legitimate means. Chavez was paid a portion of the overall bribe paid to the middle person in order for her to produce the fraudulent licenses. Chavez ultimately pled guilty. Yet, she refused to identify the recruiters.[9] On November 15, 2008, Judge Penn sentenced Chavez to a 24-month term of imprisonment.

Just one year later, on September 18, 2006, several individuals were charged in the U.S. District Court for the District of Maryland for conspiring to produce and transfer identification documents without lawful authority, in violation of 18 U.S.C. Section 1028(f). See U.S. District

---

[9]It is noteworthy that Chavez issued defendant's D.C. license on May 29, 2002. At this time, it is impossible for the government to confirm that this particular license was fraudulently issued. Chavez admitted, however, that she began selling fraudulent licenses in the early part of 2002.

Court for the District of Maryland (Greenbelt) Case Number 06-Cr-425(RWT).  This case also involved the fraudulent issuance of driver's licenses, albeit from the State of Maryland.  All the defendants pled guilty and received prison terms ranging from 16 to 30 months.  Id.

Clearly, defendant, Gonzalez, and the individuals seeking fraudulent driver's licenses failed to learn from the results of those cases.  Despite these sentences of incarceration, criminal activity continues to flourish.  In addition to holding corrupt government employees accountable for violating the public trust, individuals such as defendant, who commandeered the criminal enterprise and reaped significant economic benefits, must be sentenced harshly to deter others from committing similar criminal acts.  Had it not been for recruiters and purchasers, Director Babers noted that "the illegal activity would not have been able to start or flourish."  Id., p.4. "Employees cannot bribe themselves: they are often approached by outside entities, looking to exploit and devour."  Id.  Therefore, the imposition of a harsh sentence upon this defendant is necessary to promote respect for the law and deter others from the temptation of engaging in the procurement of fraudulent identification documents.

5.    The Need to Avoid Sentencing Disparities

Finally, a sentence at top of the applicable Guideline range will promote uniformity in sentencing.  The sentences imposed by Judge Penn in the Chavez case and Judge Titus in the Maryland DMV prosecution are comparable to the sentence the government urges this Court to impose.

III.    **CONCLUSION**

For the reasons set forth herein, the Government believes a sentence including a 30-month term of imprisonment is necessary, reasonable, and appropriate in this case.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney
for the District of Columbia
D.C. Bar Number 498610


By:     _____
        SUSAN B. MENZER, D.C. Bar Number 421700
        ELLEN CHUBIN EPSTEIN, D.C. Bar Number 442861
        Assistant United States Attorneys
        United States Attorneys Office
        Fraud and Public Corruption Section
        555 4th Street, N.W.
        Washington, D.C.  20530

# GOVERNMENT EXHIBIT 1

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**DEPARTMENT OF MOTOR VEHICLES**



OFFICE OF THE DIRECTOR

August 4, 2008

The Honorable Richard J. Leon
United States District Court for the
 District of Columbia
333 Constitution Avenue, NW
Washington, DC  20001

RE:  <u>United States v. Patricia Gonzalez, Cr. 08-100 (RJL) and related cases</u>

Dear Judge Leon:

District of Columbia Department of Motor Vehicle's (DC DMV) employee, Patricia Gonzalez, has been arrested and charged with selling credentials (i.e., driver's licenses/identification cards) to individuals who did not have the proper documentation to legally obtain a credential.  This letter serves to provide you with the impact this action had on the District and all motor vehicle jurisdictions.

As an employee, Ms Gonzalez was highly regarded and was often tasked to train and assist other employees with complex DMV functions.  She willingly violated the trust of both her co-workers and her supervisors by her illegal activities.  Her actions had a negative impact on the DC DMV, District government and other jurisdictions which count on DC to only provide credentials to individuals who meet all local and federal requirements.  As public servants, we are charged to protect and guard the resources of the residents of the District.  Ms Gonzalez not only engaged in criminal activity, but she spit on the reputation of an agency that is already the butt of late night television jokes.  At DC DMV, we have painstakingly attempted to change customer perceptions by improving service delivery.  We count on the professionalism and integrity of our employees to win the confidence and praise of our customers and other jurisdictions.  When that confidence has been violated, the entire agency pays the price of an increasingly hostile customer and law enforcement atmosphere.  This makes it increasingly difficult to deliver service to those who have no faith in either the system or its employees.  Therefore, Ms Gonzalez' actions have resulted in alienating our customers, including other jurisdictions, and increasing our wait time as we seek to first serve, and then, assist customers.

Unfortunately, the impact of Ms Gonzalez' actions cannot be fully assessed in terms of the security of the District and our nation.  In the United States, identity is a priceless commodity.  Using fraudulently obtained credentials, people have access to services and goods they are not entitled to receive such as Medicaid and alcohol.  It is also unknown whether these credentials

Page 1 of 4

involved identity theft, a multi-billion dollar crime in the US. Further, it is unknown whether these credentials were used by criminals or terrorists seeking to do harm to the District or surrounding community. Although blatant greed may have been her motivation, her actions severely compromised the security of a nation.

In 2002, DC DMV invested approximately $25 million in a state of the art driver license and camera system. In the past six years, we have enhanced the system with $20 million in upgrades to further tighten security and improve processes. The primary purpose of the system is to increase the security of our drivers licenses and identification cards. The system introduced numerous system enhancements such as unique employee profiles, enhanced management reports, advanced revenue reconciliation procedures, digital photos (including facial recognition), and both covert and overt security features on the actual credential. Although the system may be state-of-the-art, it relies on the integrity of our employees to actually utilize the system properly and comply with standard operating and issuance procedures. Ms Gonzalez, totally devoid of integrity, purposely and maliciously falsified information entered into the system and improperly used her employee profile for monetary gain.

The licensing system includes an integrated link that allows us to verify social security numbers and names directly with the Social Security Administration (SSA). Such integration allows employees the added benefit of ensuring SSN documents are authentic and that the documents belong to the person requesting the credential. Ms Gonzalez, who like most of our employees, has an in-depth knowledge of our licensing system, input erroneous SSNs, and then override the system checks to issue licenses to individuals for which the SSN and the name did not match. Such actions severely compromise our agreement with SSA to only access the system for legitimate purposes.

A recent system enhancement includes capturing in-depth information related to citizenship. Although citizenship has long been a District requirement for obtaining a credential, we did not have a means to input information such as VISA numbers. However, the enhanced version allows us to populate this information and a future enhancement will allow us to verify immigration information online using the Systematic Alien Verification for Entitlements System (SAVE). Since the District has a high immigrant population, it is critical that we only supply credentials to those who are legally allowed to have them. To accomplish this, we have centralized services with bilingual employees and access to a language line translation service, located at the DMV Service Center which Ms Gonzalez worked, available for non-Citizens. Also, other jurisdictions rely on the fact that we verify citizenship. Studies have shown that illegal immigration causes an enormous drain on District and public funds because the taxes paid by immigrants do not cover the cost of services received by them. This directly contributes to the quality of the District's education, health care, and working conditions. Although it is currently impossible for us to definitively know how many of the fraudulent credentials issued by Ms Gonzalez were to illegal immigrants, our initial analysis indicates the majority of the individuals did not have the proper documentation (i.e., SSN, birth certificate, immigration documents) to legally obtain a license in the District. Therefore, at a time with the nation is cracking down on illegal immigration, Ms Gonzalez tarnished the District's reputation as a jurisdiction that only credentials citizens and legal immigrants.

95 M Street, SW 3rd Floor, Washington, DC 20024, Office (202) 727-2200, Fax (202) 727-1010

The licensing system also includes an enhanced feature that allows us to input a customer's existing out-of-state license and verify the formatting of the state and the license number characters. This feature was implemented to add further controls to ensuring the authenticity of an out-of-state license used to convert to a District license. Individuals who convert out-of-state licenses for District licenses do not have to take the knowledge or skills test. Similar to the SSN verification, Ms Gonzalez also input erroneous out-of-state license (and identification card) information, and then overrode the system checks to issue licenses to individuals who did not take any knowledge or driving tests. Not only did this action compromise the security of the United States, but it decreased road safety by allowing individuals onto roadways without any verification that they were educated on safety and road knowledge. According to the 2008 Allstate America's Best Drivers report, D.C. drivers are 84 percent more likely to be in an accident than the average driver nationally. Therefore, Ms Gonzalez' failure to ensure individuals are skilled on road safety has a dramatically negative impact in the District. The high accident rate also contributes to the District's 20% rate of uninsured motorists; a figure that results in increased insurance fees.

In motor vehicle agencies, there is a significant street value for all documents that we produce and issue. We are well aware of the counterfeit markets thriving throughout the country. Therefore, we strive to provide our employees with training in identifying counterfeit documents. That is, documents that are created outside of the DMV to resemble authentic documents. However, Ms Gonzalez did not provide individuals with counterfeit documents; instead, she provided them with authentic District credentials that were obtained using illegal means. Such were the documents used by at least two of the 9/11 terrorists. Authentic documents are extremely difficult for other jurisdictions to identify; therefore, they are easier to convert into new licenses in other jurisdictions. Based on an internal review, at least 14 of the fraudulent documents issued by Ms Gonzalez were later converted into licenses from other jurisdictions. Unfortunately, the total number is probably significantly higher; however, motor vehicle agencies currently do not have a definitive way to track driver's license and identification cards. Therefore, we rely on the integrity of our employees.

To date, the investigation into Ms Gonzalez' unlawful activities resulted in approximately 400 man-hours of time, most of it after hours, from our Service Integrity Officer and the Director. Additionally, we estimate needing to spend another 150 man-hours, mostly using overtime, on the backend actions necessary to cancel all fraudulently issued licenses and identification cards (estimated to total 200 credentials). In total, we estimate spending approximately $29,600 on the investigation. This does not include the customer impact due to the Georgetown Service Center closing down at the time of arrest. This estimate also does not include the price the District is currently paying for law enforcement and other government agencies who may not be able to rely on the authenticity of the District's credential to investigate criminal cases or to issue credentials in other jurisdictions.

Ms Gonzalez failed to learn from the actions of past DC DMV employees. In the past 5 years, approximately two DMV employees and four cashiers (who work for the District's Office of the Chief Financial Officer) have been arrested and charged with illegal activities. Clearly, the message is not being sent, to both employees and potential customers, that criminal activity, regardless of the dollar value, will not be tolerated and that individuals caught engaging in this behavior will be prosecuted to the fullest extent of the law. As government officials, entrusted

95 M Street, SW 3rd Floor, Washington, DC 20024, Office (202) 727-2200, Fax (202) 727-1010

with taxpayers' money and the belief that we work for the common good of society, we must be held to the highest standard possible. Ms Gonzalez was well aware of the impact her criminal activity would have on the agency (and its employees and reputation throughout the country), the government and the nation (in terms of national security). Therefore, the District of Columbia Department of Motor Vehicles supports the prosecution of Ms Gonzalez to the fullest extent of the law.

Finally, it must be noted that Ms Gonzalez did not act alone. Had it not been for the recruiters and purchasers, the illegal activity would not have been able to start or flourish. All too often, we want to deflect blame from those who participate or benefit from criminal activity. However, without the constant flow of purchasers and the diligent efforts of recruiters, the majority of criminal activity in motor vehicle agencies would be non-existent. Employees cannot bribe themselves; they are often approached by outside entities, looking to exploit and devour. Therefore, it is also our expectation that the individuals benefiting from Ms Gonzalez' illegal actions, i.e., the purchasers and recruiters, be prosecuted to the fullest extent of the law.

Sincerely,

Lucinda Babers
Director

95 M Street, SW 3rd Floor, Washington, DC  20024, Office (202) 727-2200, Fax (202) 727-1010

# GOVERNMENT EXHIBIT 2



**Maryland Motor
Vehicle Administration**
6601 Ritchie Highway, N.E.
Glen Burnie, Maryland 21062

1-800-950-1MVA (1682)
*CUSTOMER SERVICE CENTER*

1-800-492-4575
*TTY*

www.marylandmva.com
*WEB SITE*



Motor Vehicle Administration

# Victim Impact Statement
## Maryland Motor Vehicle Administration and Fraudulent Licenses

TOPIC:

The Impact on The State of Maryland /Maryland Motor Vehicle Administration (MVA) as a result of fraudulently issued District of Columbia (DC) Driver's licenses ultimately surrendered to the Maryland MVA for a valid five (5) year Maryland Driver's license.

The Maryland Motor Vehicle Administration's Operational motto is "Service, Safety and Security".

Prompt and efficient "Service" to our customers, promoting "Safety" in all of our contacts and initiatives for motorists and citizens in our State and providing "Security" by protecting our employees, our citizens, our roadways and our products in every sense of the meaning.

Corruption causing the issuance of a fraudulently issued DC driver's license that is eventually turned into a Maryland Driver's license is not just a crime it is a serious breech of public trust that rises to the level of a threat to homeland security and a clear and present danger to any law enforcement officer.

Current Maryland law supporting Maryland MVA business practice, policy and procedure does not require the out of state applicant who holds a valid license from another State to verify their identity or re-certify their driving proficiency through re-examinations. Maryland MVA processes and accepts, in good faith, the valid driver's license of out of State applicants.

Although driver licenses are essentially lawful documents certifying the privilege to drive they are commonly viewed and accepted world wide as a form on one's identity.

Fraudulently issued driver's licenses is also a form of identity fraud and one of the fastest growing crimes in the United States.

**Martin O'Malley** - *Governor*                    **Anthony G. Brown** - *Lt. Governor*
**John D. Porcari** - *Secretary*        **Beverley K. Swaim-Staley** - *Deputy Secretary*        **John T. Kuo** - *Administrator*        DA-092 (03-07)

Motor Vehicle agencies nationwide spend billions of tax payer's dollars to provide a secure and integrity oriented product employing the best known counterfeit measures, bar codes, holograms, security threads and more. Employees are trained to use black lights, ID scanners, document counterfeit detection devices, however, there is no known defense against a valid license issued fraudulently by a corrupt employee.

The potential damage can be devastating and may range from the mere purchase of alcoholic beverages by a minor, to using the illegal license to carry out criminal activities or masking ones identity to enter an airport for access to aircraft executing a terrorist plot.

Fraudulently issued licenses contaminate agency databases and must be purged after costly and extensive investigations often involving numerous Investigators from the agencies involved and impacted by such criminal acts.

The employees involved in such activities, often for financial gain, are adjudicated through the justice system invoking yet another chapter of costly and time consuming processes.


Investigator H. J. Crance, MVA Police Investigator
Maryland Motor Vehicle Administration

Wm. H. Donoho, Director
MVA Investigation Division
Maryland Motor Vehicle Administration

August 1, 2008

# GOVERNMENT EXHIBIT 3



# COMMONWEALTH of VIRGINIA

**D. B. Smit**
Commissioner

Department of Motor Vehicles
2300 West Broad Street
Richmond, VA 23220

**Post Office Box 27412**
Richmond, VA 23269-0001
866-DMV-LINE or
800-435-5137

August 4, 2008

The Honorable Richard Leon
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Leon,

In late May 2008 I was contacted by Susan Menzer, USADC when she requested information concerning her ongoing criminal investigation involving the fraudulent issuance of DC driver's licenses. At the time of her request, Ms. Menzer had confirmed that an employee of the DC Department of Motor Vehicles was issuing driver's licenses to individuals who were not able to legally obtain them. Ms. Menzer also knew that several of these subjects had subsequently surrendered the DC driver's licenses to other states. A review of the information provided by Ms. Menzer indicated that seventeen (17) of these individuals had established customer records with the Virginia Department of Motor Vehicles (DMV) and that five (5) of these individuals had surrendered the DC driver's licenses to assist them in obtaining Virginia driver's licenses [a class 6 felony]. Further inquiries revealed that none of the individuals were eligible to lawfully obtain Virginia driver's licenses for various reasons such as suspensions or revocations due to serious driving infractions including DUI, crashes, or reckless driving; expired limited duration licenses which are invalid for proving lawful presence; and the inability to pass the required knowledge or skills tests.

This matter has caused the Virginia DMV to invest a considerable amount of time to maintain the integrity of customer data. Licenses will be cancelled and administrative stops placed on the suspected customers' records. Additional follow-up will be required as new information and driver's license surrenders occur. The use of the fraudulent DC licenses has allowed these individuals to evade automatic license status checks through the National Driver Register (NDR) and has caused Virginia to waive standard knowledge and skills testing based upon the applicants' out-of-state surrenders. accepted as a result of driver's license compacts and reciprocity agreements. The effect upon Virginia DMV to maintain the accuracy and integrity of these customer records will be time consuming and long term.

Sincerely,


Daniel C. Kelly, SSA